

# ATTORNEY GENERAL OF TEXAS

### GREG ABBOTT

October 27, 2004

The Honorable Allan B. Ritter
Chair, House Pensions and Investments
   Committee
Texas House of Representatives
Post Office Box 2910
Austin, Texas 78768-2910

Opinion No. GA-0264

Re: Whether the Port Arthur Economic Development Corporation may grant funds and refund sales taxes to a private corporation (RQ-0218-GA)

Dear Representative Ritter:

You ask whether the Port Arthur Economic Development Corporation (the "EDC") may grant funds and refund sales taxes to a private corporation.[1]

## I. Background

### A. Factual Context: The Agreement

The City of Port Arthur (the "City") established the EDC in 1996 under section 4A of the Development Corporation Act of 1979, TEX. REV. CIV. STAT. ANN. art. 5190.6 (Vernon 1987 & Supp. 2004-05) ("article 5190.6" or the "Act"), "to act on behalf of the City in the promotion and development of new and expanded enterprises, including certain projects, as defined in the Act."[2] Your query arises from a very specific fact situation involving an agreement the City signed in December 2002, which is described in official Port Arthur City Council (the "City Council") resolutions provided by the City.

On December 17, 2002, the City and Target Corporation (the "Corporation") entered into a "Grant and Sales Tax Refund Agreement for Retail Facility Redevelopment and Expansion Between the City of Port Arthur and Target Corporation" (the "Agreement"). *See* City Letter, *supra* note 1

---

[1]*See* Letter from Honorable Allan B. Ritter, Chair, House Pensions and Investments Committee, Texas House of Representatives, to Honorable Greg Abbott, Texas Attorney General (May 3, 2004) (on file with the Opinion Committee; *also available at* http://www.oag.state.tx.us) [hereinafter Request Letter], attaching Letter from Mark T. Sokolow, City Attorney, City of Port Arthur, to Honorable Allan B. Ritter, Chair, House Pensions and Investments Committee, Texas House of Representatives (Apr. 1, 2004) [hereinafter City Letter] and Letter from James E. Wimberley, McPherson Monk Hughes Bradley Wimberley & Steele L.L.P., Counsel for the EDC (Mar. 31, 2004) [hereinafter EDC Letter].

[2]Letter from Mark T. Sokolow, City Attorney, City of Port Arthur, to Beverly McGaffey, Opinion Committee, Office of the Attorney General (July 14, 2004) (attaching Ordinance No. 96-08) (on file with the Opinion Committee) [hereinafter City Letter of July 14, 2004].

(Resolution No. 03-371, Ex. A). In pertinent part, the City agreed to pay the Corporation a $300,000 "grant" within thirty days of the Corporation opening a retail store in the City. *See id.* (Resolution No. 03-371, Ex. A, ¶ 2.01). The City also agreed to refund to the Corporation a portion of sales tax proceeds from retail sales at the store over a certain term. *See id.* The Agreement states that "[o]nly the City Portion of the Total Tax shall be subject to this Agreement." *Id.* The Agreement is between and is signed on behalf of the City and the Corporation; the EDC is not a party to the Agreement. *See id.* (Resolution No. 03-371, Ex. A, at 1, 6). In a December 12, 2002 resolution authorizing the City's city manager to approve the Agreement, however, the City Council noted that "the Section 4A Economic Development Corporation can fund projects that will promote economic development, increase employment and commercial business development and expansion." *Id.* (Resolution No. 02-367, at 1-2).

In December 2002, before entering into the Agreement, the City Council also created a neighborhood empowerment zone encompassing the proposed retail store pursuant to chapter 378 of the Local Government Code. *See id.* (Resolution No. 02-366). Section 378.004 of the Local Government Code authorizes a municipality that establishes a neighborhood empowerment zone to "enter into agreements, for a period of not more than 10 years, for the purpose of benefitting the zone, for refunds of municipal sales tax on sales made in the zone." TEX. LOC. GOV'T CODE ANN. § 378.004 (Vernon Supp. 2004-05).

Approximately a year later, on December 16, 2003, at a joint meeting, the City Council and the EDC's board of directors jointly adopted a resolution "pertaining to the [EDC's participation in] the Target Project." City Letter, *supra* note 1 (Resolution No. 03-371). The resolution states that when the City signed the Agreement, "it was contemplated . . . that the City of Port Arthur was acting on its own behalf and on behalf of its affiliated" EDC; that the EDC "would pay the sum of $300,000 within thirty (30) days of the opening of the store"; and that the City and the EDC "would each rebate 50% of the sales tax collected." *Id.* (Resolution No. 03-371, at 1). In the resolution, the City Council resolved that the EDC would pay the Corporation $300,000 "in compliance with the agreement." *Id.* (Resolution No. 03-371, at 2, § 2). The City Council also resolved that the EDC would pay the Corporation half the sales tax rebate provided in the Agreement. *See id.* (Resolution No. 03-371, at 2, § 3). However, later in December 2003, the EDC board of directors rescinded the resolution and withdrew from participating in the Target project "unless and until the EDC Board received a written opinion from the Attorney General confirming the EDC's ability to participate." EDC Letter, *supra* note 1, at 3.

On March 30, 2004, the City Council authorized the City director of finance to pay the Corporation $300,000 from a City account "as an interim loan to the project until an Attorney General Opinion is received." City Letter, *supra* note 1 (Resolution No. 04-117, § 2). Pursuant to the resolution, the EDC will repay the City "if an Attorney General Opinion finds this expenditure is an eligible EDC project." *Id.* (Resolution No. 04-117, § 3). The resolution indicates that the City will seek an opinion on the EDC's authority to make the $300,000 payment. *See id.* (Resolution No. 04-117, § 4).

We have not been provided with official EDC documents regarding its board of directors' official actions with respect to the Agreement or an EDC project related to the Agreement (aside

from the December 2003 joint resolution, which the EDC board of directors later rescinded). A brief submitted on the City's behalf states that "public action in open sessions of city council meetings evidencing the city's intent to fund the joint incentive package with the EDC took place as early as the spring of 2002" and that "correspondence, contact and meetings between the city manager and officials of the EDC occurred in December, 2002."[3] The brief further asserts that

> the project was being undertaken by both the city and the EDC as early as December, 2002, when information was provided to the director of the EDC. Subsequent letters between the counsel for EDC and the city manager and city attorney; and later, a meeting between the city manager and officials of the EDC in executive session, further document the undertaking.

Parker Brief, *supra* note 3, at 4. However, the brief also states that the EDC board of directors took no vote on the project "other than the ratification vote in December, 2003." *Id.*

## B.    Legal Context:  2003 Amendments to the Act

Between December 2002, when the City entered into the Agreement, and December 2003, when the City Council and the EDC jointly stated that the EDC would pay the grant and a portion of the sales tax rebate, the legislature significantly amended article 5190.6 in House Bill 2912. *See* Tex. H.B. 2912, 78th Leg., R.S. (2003). Three amendments to article 5190.6 are particularly important here.

First, as the bill analyses note, House Bill 2912 amends the Act "to refocus the use of the economic development sales tax on the creation or retention of primary jobs."[4] Under the Act prior to its amendment in 2003, particularly section 2(11)(A), which defines the term "project," a section 4A development corporation was authorized to finance costs associated with land, buildings, equipment, facilities, targeted infrastructure, and improvements "to promote new and expanded business development."[5] As amended by House Bill 2912, however, section 2(11)(A) of the Act now limits the purpose of a "project" to "the creation or retention of primary jobs." TEX. REV. CIV. STAT. ANN. art. 5190.6, § 2(11)(A), *as amended by* Act of May 30, 2003, 78th Leg., R.S., ch. 1132,

---

[3]Brief from Carl Parker, The Parker Law Firm, to Nancy Fuller, Chair, Opinion Committee, Office of the Attorney General at 3-4 (June 23, 2004) (on file with the Opinion Committee) [hereinafter Parker Brief].

[4]HOUSE COMM. ON ECONOMIC DEVELOPMENT, BILL ANALYSIS, Tex. H.B. 2912, 78th Leg., R.S. (2003); SENATE COMM. ON STATE AFFAIRS, BILL ANALYSIS, Tex. H.B. 2912, 78th Leg., R.S. (2003) (Engrossed version); SENATE COMM. ON STATE AFFAIRS, BILL ANALYSIS, Tex. H.B. 2912, 78th Leg., R.S. (2003) (Committee Report Substitute).

[5]*See infra* at 7-8 n.17 (quoting the article 5190.6, section 2(11)(A) definition of "project" prior to the 2003 amendment); *see also* Tex. Att'y Gen. Op. No. JC-0362 (2001) (discussing a section 4A development corporation's authority to undertake projects under former law).

§ 1, 2003 Tex. Gen. Laws 3218, 3218-19.[6] As defined by a provision added by House Bill 2912, the term "primary job" does not include jobs in retail sales. *See* Act of May 30, 2003, 78th Leg., R.S., ch. 1132, § 2, 2003 Tex. Gen. Laws 3218, 3219 (adding section 2(17) defining "primary job"). This limitation is particularly significant to section 4A development corporations, because section 4A does not further define the term "project." By contrast, section 4B defines the term "project" by reference to section 2 but also contains an additional definition of the term. *Compare* TEX. REV. CIV. STAT. ANN. art. 5190.6, § 4A (Vernon Supp. 2004-05) *with id.* § 4B(a)(2)(A)-(E).

Second, House Bill 2912 amended section 2(11)(A) to include within the definition of "project" the word "expenditures." Section 2(11)(A) now provides for expenditures "that are for the creation or retention of primary jobs"[7] and expenditures for certain limited infrastructure.[8] House Bill 2912 also added section 40 to the Act, which provides that a development corporation may not "provide a direct incentive to or make an expenditure on behalf of a business enterprise under a project" unless the corporation enters into a performance agreement with the business enterprise that includes certain mandated terms. *See* Act of May 30, 2003, 78th Leg., R.S., ch. 1132, § 12, 2003 Tex. Gen. Laws 3218, 3222-23 (adding section 40).

Third, section 3 of article 5190.6 had directed that "[t]his Act shall be liberally construed in conformity with the intention of the legislature herein expressed."[9] In House Bill 2912, the

---

[6]Section 2(11)(A) now defines "project" in pertinent part as follows:

> the land, buildings, equipment, facilities, *expenditures*, targeted infrastructure, and improvements (one or more) *that are for the creation or retention of primary jobs* and that are found by the board of directors to be required or suitable for the development, retention, or expansion of manufacturing and industrial facilities, research and development facilities, transportation facilities (including but not limited to airports, ports, mass commuting facilities, and parking facilities), sewage or solid waste disposal facilities, recycling facilities, air or water pollution control facilities, facilities for the furnishing of water to the general public, distribution centers, small warehouse facilities capable of serving as decentralized storage and distribution centers, primary job training facilities for use by institutions of higher education, and regional or national corporate headquarters facilities.
>
> "Project" also includes job training required or suitable for the promotion of development and expansion of business enterprises and other enterprises described by this Act, as provided by Section 38 of this Act.

TEX. REV. CIV. STAT. ANN. art. 5190.6, § 2(11)(A), *as amended by* Act of May 30, 2003, 78th Leg., R.S., ch. 1132, § 1, 2003 Tex. Gen. Laws 3218, 3218-19 (emphasis added).

[7]*See id.*

[8]House Bill 2912 added the following to section 2(11)(A): "'Project' also includes expenditures found by the board of directors to be required or suitable for infrastructure necessary to promote or develop new or expanded business enterprises limited to streets and roads, rail spurs, water and electric utilities, gas utilities, drainage and related improvements, and telecommunications and Internet improvements." *Id.*

[9]Act of May 23, 1979, 66th Leg., R.S., ch. 700, § 3, 1979 Tex. Gen. Laws 1675, 1677.

legislature amended this provision to strike the word "liberally." *Id.* § 3, 2003 Tex. Gen. Laws at 3220 (amending section 3(b)).

House Bill 2912 contains a grandfather provision continuing former law in effect for certain projects. Its amendments "apply only to a project that is undertaken or approved, by an election or otherwise, on or after the effective date of this Act." *Id.* § 14, 2003 Tex. Gen. Laws at 3223. A project that is undertaken or approved before House Bill 2912's effective date "is governed by the law in effect on the date the project is undertaken or approved, and the former law is continued in effect for that purpose." *Id.* House Bill 2912 took effect on June 20, 2003. *See id.* at 3223.

## C.    Issues

The City and the EDC wish to know whether the EDC may now pay $300,000 and refund sales taxes to the Corporation pursuant to the Agreement.[10] Both the City and the EDC appear to agree that paying these funds to the Corporation is not an appropriate section 4A development corporation project under the Act as amended by House Bill 2912 because locating the Corporation's retail store in the City will not create or retain primary jobs as required by section 2(11)(A). Assuming this is the case, the EDC's authority depends upon (i) whether former law authorized the EDC to make the payment and refund sales taxes and (ii) if so, whether paying these funds to the Corporation would constitute a "project" "undertaken or approved" before June 20, 2003 for which former law is continued in effect. Before considering these issues, however, we first review a section 4A development corporation's authority to act and the extent to which a city that has created a section 4A development corporation may contract and expend funds on the corporation's behalf. These concerns underlie the facts outlined in the resolutions and the City's brief and are essential to the primary issues.

## II.    Whether a City That has Created a Development Corporation May Act on the Corporation's Behalf

Section 4A of the Act authorizes a qualifying city to create a development corporation governed by that section, *see* TEX. REV. CIV. STAT. ANN. art. 5190.6, § 4A(b)(1) (Vernon Supp. 2004-05), and, if the voters approve it, authorizes the city to levy a sales and use tax for the benefit of that corporation, *see id.* § 4A(d). The Act generally requires each corporation to "have a board of directors." *Id.* § 11(a). More specifically, section 4A provides that a development corporation is governed by a board of five directors "who are appointed by the governing body of the city and who serve at the pleasure of the governing body." *Id.* § 4A(c). In addition to this authority to appoint and remove directors, the Act also vests in the creating city power over the corporation's governance and operation, such as the authority to approve changes to the corporation's articles of incorporation and by-laws and to approve the corporation's programs and expenditures.[11] Indeed,

---

[10]*See* City Letter, *supra* note 1, at 1; EDC Letter, *supra* note 1, at 2.

[11]*See* TEX. REV. CIV. STAT. ANN. art. 5190.6, §§ 17(a) (Vernon Supp. 2004-05) ("The articles of incorporation may at any time and from time to time be amended, provided that the board of directors files with the governing body of the unit under whose auspices the corporation was created a written application requesting that the unit approve such

(continued...)

in outlining development corporations' general powers, section 23(a)(13) provides that a development corporation may "exercise all powers necessary or appropriate to effect any or all of the purposes for which the corporation is organized *which powers shall be subject at all times to the control of the governing body* of the unit under whose auspices the corporation was created." *Id.* § 23(a)(13) (emphasis added).

Significantly, however, the powers of a development corporation are vested in the corporation's board of directors. *See id.* § 11(a) ("The corporation shall have a board of directors in which all powers of the corporation shall be vested."). The board of directors is required to act as a body, *see id.* § 14(b) ("The act of the majority of the directors present at a meeting at which a quorum is present *shall be the act of the board* of directors, unless the act of a greater number is required by the articles of incorporation or the bylaws.") (emphasis added), and is subject to the Open Meetings Act, *see id.* § 11(b) ("The board of directors is subject to the open meetings act.").[12] As a result, the board of directors of a development corporation may not act except by a final official action taken in an open meeting. *See id.* §§ 11(a)-(b), 14(b); Tex. Att'y Gen. Op. No. JC-0109 (1999) (concluding that although no statute specifically requires a development corporation to provide notice of a land sale, a corporation's board of directors may not take final action on a land sale except by a final official action in an open meeting after providing notice under the Open Meetings Act). Although the Open Meetings Act permits a governmental body to deliberate in executive session regarding economic development negotiations, *see* TEX. GOV'T CODE ANN. § 551.087 (Vernon Supp. 2004-05), "[a] final action, decision, or vote on a matter deliberated in a closed meeting . . . may only be made in an open meeting that is held in compliance with" the Open Meetings Act's notice requirements, *id.* § 551.102 (Vernon 1994).

Your query specifically involves a development corporation's authority to enter into contracts and to expend sales and use tax proceeds. A development corporation has all the powers of a nonprofit corporation and is authorized to contract on its own behalf. *See* TEX. REV. CIV. STAT. ANN. art. 5190.6, § 23(a) (Vernon Supp. 2004-05) ("The corporation shall have and exercise all of the rights, powers, privileges, authority, and functions given by the general laws of this state to

---

[11](...continued) amendment to the articles of incorporation, specifying in such application the amendment or amendments proposed to be made. If the governing body by appropriate resolution finds and determines that it is advisable that the proposed amendment be made, authorizes the same to be made, and approves the form of the proposed amendment, the board of directors shall proceed to amend the articles as hereinafter provided."), 17(b) ("The articles of incorporation may also be amended at any time by the governing body of the unit under whose auspices the corporation was created at its sole discretion by adopting an amendment to the articles of incorporation of the corporation by resolution of such governing body and delivering the articles of amendment to the secretary of state as hereinafter provided."), 21 ("The unit will approve all programs and expenditures of the corporation and annually review any financial statements of the corporation, and at all times the unit will have access to the books and records of the corporation."), 23(a)(11) (authorizing a development corporation "to make and alter bylaws not inconsistent with its articles of incorporation or with the laws of this state with the approval of the unit under whose auspices the corporation was created by resolution of the governing body for the administration and regulation of the affairs of the corporation").

[12]*See generally* Tex. Att'y Gen. Op. No. JM-120 (1983) at 3-4 (concluding that section 11(b) of the Act effectively repealed section 14(c), which provides that "[a]ny action required by this Act to be taken at a meeting of the directors of a corporation or any action which may be taken at a meeting of the directors may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by all of the directors. Such consent shall have the same force and effect as a unanimous vote.").

nonprofit corporations incorporated under the Texas Non-Profit Corporation Act . . . but to the extent that the provisions of the general laws are in conflict or inconsistent with this Act, this Act prevails."); *Gaut v. Amarillo Econ. Dev. Corp.*, 921 S.W.2d 884, 887 (Tex. App.–Austin 1996, no writ) ("As a non-profit corporation, [a section 4A development corporation] has the power to make contracts and incur liabilities."). Morever, to enter into a contract, a development corporation must do so pursuant to an official act of its board of directors, in which its authority is vested and which may take final action only in an open meeting. *See* TEX. REV. CIV. STAT. ANN. art. 5190.6, §§ 11(a)-(b), 14(b) (Vernon Supp. 2004-05). No provision in the Act authorizes a city's governing body to enter into a contract on behalf of a section 4A development corporation it has created.

In addition, this office has concluded that section 4A vests the authority to expend sales and use tax proceeds in the development corporation, not the city. *See* Tex. Att'y Gen. Op. No. JC-0488 (2002) at 3. The Act contemplates that a section 4A development corporation will use its sales and use taxes for projects that its board of directors initiates and that the city's governing body has the authority to review. *See* TEX. REV. CIV. STAT. ANN. art. 5190.6, §§ 4A(f), 21 (Vernon Supp. 2004-05). Specifically, after the tax has been approved by the voters and the Comptroller remits tax proceeds to the city, the city "shall deliver the proceeds *to the corporation to use* in carrying out its functions." *Id.* § 4A(f) (emphasis added). The Act provides that the governing body of a city that has created a development corporation "will approve all programs and expenditures of the corporation," *id.* § 21, thus authorizing the governing body to disapprove programs and expenditures, but the Act does not authorize the city's governing body to spend the development corporation's sales and use taxes. Section 4A sales and use tax proceeds may not be expended unless authorized by the development corporation's board of directors' final official action in an open meeting. *See id.* §§ 11(a)-(b), 14(b).

### III. Whether Former Law Authorized the Grant and Sales Tax Refund

#### A. Authority under Article 5190.6 and *Gaut*

You ask about the EDC's authority prior to the 2003 amendments to pay the Corporation the $300,000 grant and the sales tax refund described in the Agreement. *See supra* note 1. Generally, a section 4A development corporation may use sales and use taxes (i) to finance costs of projects;[13] (ii) for job training;[14] and (iii), to a limited extent, for promotional purposes.[15] The authority of a particular development corporation may be limited by the resolution creating the corporation or ballot language restricting the use of the section 4A tax. *See, e.g.,* TEX. REV. CIV. STAT. ANN. art. 5190.6, §§ 4(a) (Vernon Supp. 2004-05) (the resolution creating a corporation must specify its purpose), 4A(n) (the election on imposing a tax may limit the time the tax is imposed), 4A(r) (the election on imposing a tax may limit the use of tax proceeds to specific projects). It may also be limited by financing documents relating to the corporation's bonds. *See, e.g., id.* §§ 4A(f)

---

[13]*See* TEX. REV. CIV. STAT. ANN. art. 5190.6, §§ 4A(f), 21, 23(a)(6) (Vernon Supp. 2004-05); *see also id.* §§ 2(4), (11) (defining "cost" and "project"), 4A(i) (limiting a section 4A development corporation's authority to undertake certain projects and specifically authorizing others).

[14]*See id.* §§ 2(11)(A), 4A(f), 38.

[15]*See id.* § 4A(b).

(tax proceeds may be pledged to bond debt service), 25(e) (a pledge or agreement to secure bonds is in effect until the bonds are fully paid). The ballot language authorizing the EDC tax did not limit its use to a specific project,[16] and we assume there are no bond-related limitations on the EDC's authority.

The City resolutions suggest that the grant and sales tax refund constituted a "project" under former law; neither the City nor the EDC suggest that they might be authorized as spending for job training or promotional purposes. Unlike section 4B of the Act, section 4A does not contain a separate definition of the term "project." Thus, prior to June 20, 2003, the Act authorized a section 4A development corporation to finance the costs of projects as that term was generally defined in section 2(11)(A). Section 2(11)(A) defined "project" to include, in pertinent part, land, buildings, equipment, facilities, targeted infrastructure, and improvements, that "promote new and expanded business development." *Id.* § 2(11)(A).[17] Section 2(4) broadly defined the term "cost" to include various expenses associated with a project.[18] In addition, prior to 2003, section 4A(i) limited a

---

[16]*See* City Letter of July 14, 2004, *supra* note 2 (Ordinance No. 95-68).

[17]Prior to House Bill 2912, section 2(11)(A) defined the term "project" in pertinent part as follows:

> (A) "Project" shall mean the land, buildings, equipment, facilities, targeted infrastructure, and improvements (one or more) *to promote new and expanded business development or found by the board of directors to be required or suitable for the promotion of development and expansion of* manufacturing and industrial facilities, job creation and retention, job training, educational facilities, research and development facilities, transportation facilities (including but not limited to airports, ports, mass commuting facilities, and parking facilities), sewage or solid waste disposal facilities, recycling facilities, air or water pollution control facilities, facilities for the furnishing of water to the general public, distribution centers, small warehouse facilities capable of serving as decentralized storage and distribution centers, and facilities for use by institutions of higher education, and for the promotion of development or redevelopment and expansion, including costs of administration and operation, of a military base closed or realigned pursuant to recommendation of the Defense Closure and Realignment Commission . . . .

TEX. REV. CIV. STAT. ANN. art. 5190.6, § 2(11)(A), *as enacted by* Act of May 23, 1979, 66th Leg., R.S., ch. 700, § 2(12), 1979 Tex. Gen. Laws 1675, 1676, *as renumbered by* Act of May 20, 1999, 76th Leg., R.S., ch. 973, § 1, 1999 Tex. Gen. Laws 3722, 3722-23, *as last amended by* Act of May 22, 2001, 77th Leg., R.S., ch. 850, § 1, 2001 Tex. Gen. Laws 1698, 1698 (emphasis added).

[18]Section 2(4), which the legislature did not amend in 2003, provides as follows:

> "Cost" as applied to a project shall mean and embrace the cost of acquisition, cleanup, construction, reconstruction, improvement, and expansion, including the cost of the acquisition of all land, rights-of-way, property rights, easements, and interests, the cost of all machinery and equipment, financing charges, inventory, raw materials and other supplies, research and development costs, interest prior to and during construction and for one year after completion of construction whether or not capitalized, necessary reserve funds, cost of estimates and of engineering and legal services, plans, specifications, surveys, estimates of cost and of revenue, other expenses necessary or incident to determining the

(continued...)

section 4A development corporation's authority to undertake certain projects to provide transportation facilities, solid waste disposal facilities, or air or water pollution control facilities, but specifically authorized a project to provide a general aviation business service airport or port-related facilities, neither of which is relevant here.[19]  Significantly, section 2(11)(A) limited a section 4A development corporation to expending sales and use taxes for costs associated with land, buildings, equipment, facilities, targeted infrastructure, or improvements that would promote new and expanded business development and did not authorize a section 4A development corporation to use such taxes to grant funds or to refund sales taxes to a corporation for opening a retail store.

As we have noted, House Bill 2912 added the word "expenditure" to the definition of the term "project" in section 2(11)(A).  Arguably, the term "expenditure" could embrace "grants" or "sales tax refunds," which would permit a section 4A development corporation to use sales and use tax proceeds for expenses beyond costs associated with land, facilities, and other tangible items, provided that the expenditure complies with section 40 of the Act.  *See id.* § 40 (House Bill 2912 requirement that a development corporation may not "provide a direct incentive to or make an expenditure on behalf of a business enterprise under a project" unless the corporation enters into a performance agreement with the business enterprise).  However, the term "expenditure" was not included in section 2(11)(A) before the 2003 amendment.

The City suggests that the EDC's participation in the Agreement is supported by *Gaut.  See* Parker Brief, *supra* note 3, at 2.  In *Gaut,* the City of Amarillo had established the Amarillo Economic Development Corporation ("AEDC") and levied a sales and use tax under section 4A of the Act.  *See Gaut,* 921 S.W.2d at 885-86.  The court considered a challenge to a contract between the AEDC and American Airlines pursuant to which the AEDC made payments to the airline company to provide jet service to the City of Amarillo.  *See id.*  Gaut, the plaintiff, contended that the AEDC's payments to the airline company were illegal because the contract was not a project under the Act.  *See id.* at 887.  The court agreed that the "contract is not the type of project that

---

[18](...continued)

> feasibility and practicability of acquiring, cleaning, constructing, reconstructing, improving, and expanding any such project, administrative expense and such other expense as may be necessary or incident to the acquisition, cleanup, construction, reconstruction, improvement, and expansion thereof, the placing of the same in operation, and the financing or refinancing of any such project, including the refunding of any outstanding obligations, mortgages, or advances issued, made or given by any person for any of the aforementioned costs.

TEX. REV. CIV. STAT. ANN. art. 5190.6, § 2(4) (Vernon Supp. 2004-05).

[19]*See* TEX. REV. CIV. STAT. ANN. art. 5190.6, § 4A(i), *as enacted by* Act of May 27, 1989, 71st Leg., R.S., ch. 877, § 2, 1989 Tex. Gen. Laws 3871, 3872, *as renumbered by* Act of May 10, 1991, 72d Leg., R.S., ch. 184, § 1, 1991 Tex. Gen. Laws 802, 803, *as last amended by* Act of March 11, 1993, 73d Leg., R.S., ch. 12, § 3, 1993 Tex. Gen. Laws 49, 50-51, *and* Act of May 22, 1993, 73d Leg., R.S., ch. 1022, § 2, 1993 Tex. Gen. Laws 4424, 4424-25 ("Except as provided by this subsection, the corporation may not undertake a project the primary purpose of which is to provide transportation facilities, solid waste disposal facilities, or air or water pollution control facilities.  However, the corporation may provide those facilities to benefit property acquired for a project having another primary purpose.  The corporation may undertake a project the primary purpose of which is to provide: (1) a general aviation business service airport that is an integral part of an industrial park; or (2) port-related facilities to support waterborne commerce.").

involves the construction, acquisition, sale, lease, or purchase of a building." *Id.* However, "liberally construing the Development Corporation Act in conjunction with the Non-Profit Corporation Act," the court disagreed "that the AEDC is limited to considering only projects as defined by the Development Corporation Act." *Id.* The court noted that the AEDC had the power to contract and incur liabilities. *Id.* Given that authority and the "summary judgment evidence reflecting the probable enhancement to the Amarillo economy as well as the economic benefits to the residents of the Texas panhandle" resulting from the jet service contract, the court concluded that the contract was within the stated purpose of the Act. *See id.* at 887-88.

Arguably, relying on *Gaut,* the Act could have been construed prior to House Bill 2912 to authorize a section 4A development corporation to use sales and use tax proceeds to promote economic development by means other than projects defined in the Act, including entering into a contract to grant funds and refund sales taxes to a private corporation to promote economic development. In 1999, however, this office questioned the *Gaut* court's construction of the Act and suggested that 1997 amendments to the Act superseded the court's construction. *See* Tex. Att'y Gen. Op. No. JC-0118 (1999) at 6.

Moreover, attorney general opinions construing the Act prior to the 2003 amendments stressed that the determination whether a particular project or expenditure would promote business development was a question of fact within the discretion of the board of directors of the development corporation in the first instance, subject to judicial review for abuse of discretion. *See* Tex. Att'y Gen. Op. No. JC-0362 (2001) at 5 ("the determination of whether a particular project will promote the economic development purposes of the Act is, in general, a question of fact within the discretion of the board of directors of the development corporation in the first instance").[20] Thus, even if one could argue that *Gaut* authorized the EDC to enter into the Agreement, it does not appear that the EDC made the necessary determination to support the Agreement. *See* Parker Brief, *supra* note 3, at 3-4 (stating that the EDC took no vote with respect to the Agreement). Although the governing body of a city that has created a development corporation may disapprove a project or expenditure that the development corporation has proposed or approved, the City was not authorized to make the initial determination that a project or expenditure would promote economic development. *See* part II, *supra*; *see also* Tex. Att'y Gen. Op. No. GA-0086 (2003) at 3 (concluding that whether a proposed statue "would serve a promotional purpose is a question of fact for the [development corporation's] board of directors to resolve in the first instance, subject to judicial review, and, . . . [the] City Council's supervisory authority").

### B.     Constitutional Limitations

In addition, the EDC's authority to pay money to a private corporation is and was limited by the Texas Constitution. Section 4A taxes are public funds subject to article III, section

---

[20]*See also* Tex. Att'y Gen. LO-95-072, at 3 (the determination whether a section 4B development corporation may construct sanitary sewer lines in an existing residential subdivision must be made by the board of directors in the first instance subject to review for abuse of discretion), LO-92-086, at 2 (concluding that it was within the discretion of a section 4A development corporation in the first instance to characterize the use of sales tax proceeds to finance bonds for the Texas State Technical College System Extension Center as the promotion of commercial or economic development given the statute governing such centers).

52(a). *See* TEX. CONST. art. III, § 52(a) ("the Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation"); Tex. Att'y Gen. Op. No. JC-0118 (1999) at 9.[21] As a result, section 4A development corporations are prohibited from making gifts or donations of section 4A sales and use tax proceeds. *See* Tex. Att'y Gen. Op. No. JC-0118 (1999) at 8 (a development corporation may not make a gift or donation of section 4B tax proceeds); *see also* Tex. Att'y Gen. LO-97-061, at 4-5 (the Act does not permit a section 4A development corporation to make gifts of public funds), LO-94-037, at 3 (the Act does not authorize section 4A development corporations to make gifts).

Like any other entity subject to this constitutional limitation, a section 4A development corporation "will avoid violating article III, section 52" if its governing body "(i) determines in good faith that the expenditure serves a public purpose and (ii) places sufficient controls on the transaction, contractual or otherwise, to ensure that the public purpose is carried out." Tex. Att'y Gen. Op. Nos. GA-0188 (2004) at 4, GA-0078 (2003) at 4 (citing *Young v. City of Houston,* 756 S.W.2d 813, 814 (Tex. App.–Houston [1st Dist.] 1988, writ denied); *City of Coleman v. Rhone,* 222 S.W.2d 646, 649 (Tex. Civ. App.–Eastland 1949, writ ref'd)). These requirements apply equally to section 4A tax expenditures for project costs, *see* Tex. Att'y Gen. Op. No. JC-0118 (1999) at 9 (sales and use tax expenditures for project costs "must be pursuant to a contractual or other arrangement sufficient to ensure that the funds are used for the purposes authorized"), and for non-project expenditures arguably authorized by *Gaut,* which itself involved a contract between the AEDC and the airline pursuant to which the development corporation received valuable consideration, *see id.*; *see also* Tex. Att'y Gen. LO-94-037, at 3 (no provision in section 4A or the Act specifically authorizes development corporation to make grants; "the act requires that any 'grant' by [the section 4A development corporation] . . . be made under [a] contractual or other arrangement sufficient to ensure that the funds granted are actually used in furtherance of the purposes of the act").

Again, although the creating city's governing board has the power to disapprove a proposed development corporation contract, the city may not enter into a contract on the development corporation's behalf. The corporation's board must make the requisite determinations and approve and bind the corporation to a contract in final official actions taken in open meetings. *See* part II, *supra.* The facts presented by the City do not indicate that the EDC's board of directors made such determinations or imposed the requisite contractual controls. *See* part I.A, *supra.*

---

[21]In 1979, this office concluded that the Act did not implicate article III, section 52 because no public moneys were involved in the expenditures authorized under the Act at that time. *See* Tex. Att'y Gen. Op. No. MW-85 (1979) at 3. Later, the legislature amended the Act to add sections 4A and 4B authorizing the collection and expenditure of sales and use taxes. *See* TEX. REV. CIV. STAT. ANN. art. 5190.6, §§ 4A(a)-(b), (d), 4B(a), (d), (g) (Vernon 1987 & Supp. 2004-05). Thereafter, Attorney General Opinion JC-0118 concluded that "[e]xpenditure of sales and use tax proceeds is unquestionably the expenditure of public moneys within the meaning of article III, section 52(a). The constitutional requirement that any expenditure be made pursuant to a contractual or similar arrangement is not nullified by section 22 of the Act providing that a development corporation 'is not intended to be and shall not be a political subdivision or a political corporation within the meaning of the constitution and the laws of the state, including without limitation Article III, Section 52 . . . .'" Tex. Att'y Gen. Op. No. JC-0118 (1999) at 9. As Attorney General Opinion JC-0118 noted, "While the legislature may exempt a development corporation from the application of other legislative enactments, it has no authority to exempt a development corporation from the application of a constitutional provision." *Id.*

In sum, prior to House Bill 2912, the Act as construed by the court in *Gaut* arguably might have authorized the EDC to pay $300,000 and a sales tax refund to the Corporation if the EDC's board of directors had determined in good faith that the expenditures would promote business development. In addition, article III, section 52(a) of the Texas Constitution required the EDC's board of directors (i) to determine that such expenditures of section 4A sales and use tax proceeds were for a public purpose of the EDC, and (ii) to impose contractual controls to ensure that the funds would be used for the purposes authorized, neither of which it appears to have done.

## IV.    Whether the Payments Constitute a Project Undertaken or Approved Before June 20, 2003

Under House Bill 2912's grandfather provision, section 14, former law is continued in effect only for projects undertaken or approved before June 20, 2003:

> The changes in law made by this Act apply only to a *project* that is *undertaken or approved, by an election or otherwise,* on or after the effective date of this Act. A *project* that is *undertaken or approved* before the effective date of this Act is governed by the law in effect on the date the project is undertaken or approved, and the former law is continued in effect for that purpose.

Act of May 30, 2003, 78th Leg., R.S., ch. 1132, § 14, 2003 Tex. Gen. Laws 3218, 3223 (effective June 20, 2003) (emphasis added).

Because the Act expressly defines the term "project," the term in section 14 must be construed according to those definitions as they existed under prior law. *See* TEX. GOV'T CODE ANN. § 312.002(b) (Vernon 1998) (terms of art in civil statutes are to be construed according to their particular meaning). For a section 4A development corporation, the term "project" prior to June 20, 2003 was defined by section 2(11)(A) and, in some cases, further governed by section 4A(i). Accordingly, in the case of a section 4A development corporation, section 14 continues former law only for projects within the scope of section 2(11)(A) and 4A(i).

Furthermore, a project must have been "undertaken or approved" before House Bill 2912's effective date. Neither the Act, House Bill 2912, nor case law defines these terms in connection with a project and, as a result, we construe them according to their common meanings. *See id.* § 312.002(a) (words in civil statutes that are not terms of art shall be given their ordinary meaning). The verb "undertake" means to "take in hand, enter upon, or set about" or, more specifically, "to put oneself under obligation to perform," WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1287 (9th ed. 1990); *see also* BLACK'S LAW DICTIONARY 1527 (7th ed. 1999) (defining "undertake" as "to take on an obligation or task" or "to give a formal promise; guarantee"), and therefore we construe the term "undertaken" to include projects that a development corporation had already begun or to which it had already contractually obligated itself. The verb "approve" means "to give formal or official sanction to," WEBSTER'S at 98; *see also* BLACK'S at 98 (defining "approve" to mean "to give formal sanction to; to confirm authoritatively"), and we construe the term "approved" to include a project that a development corporation approved by official board action. In addition, the Act authorizes

a city that establishes a section 4A development corporation to "allow the voters to vote on a ballot proposition that limits the use of the sales and use tax to a specific project." TEX. REV. CIV. STAT. ANN. art. 5190.6, § 4A(r) (Vernon Supp. 2004-05); see also id. § 4A(s) (s)(1) (authorizing a city that has created a section 4A development corporation to submit to the voters a ballot proposition that authorizes the corporation to use the sales and use tax, including any amount previously authorized and collected, for a specific project or for a specific category of projects, including a sports venue and related infrastructure, that does not qualify under section 4A but qualifies under section 4B). In referencing projects approved by election in the first sentence of section 14, the legislature recognized that the electorate may approve specific projects. Accordingly, we construe section 14's second sentence to continue former law for a specific project approved by the voters at an election prior to House Bill 2912's effective date. Taken together, the term "undertaken" refers to projects that are already underway whereas the term "approved" refers to projects that have been officially approved but not yet begun.

Thus, in the case of a section 4A development corporation, section 14 continues former law only for projects as defined under section 2(11)(A) (and, in some cases, further governed by section 4A(i)) prior to June 20, 2003. Moreover, for former law to continue, the project must be one that, before June 20, 2003, (i) the development corporation had already begun or had contractually committed itself to, (ii) the development corporation's board of directors had officially approved but not yet begun, or (iii) the voters had approved pursuant to section 4A(r)-(s) of the Act. The development corporation's board of directors should be able to demonstrate that a project was "undertaken or approved before the effective date of this Act" either by reference to some final official action taken by the board in an open meeting prior to June 20, 2003, or by reference to the terms of an election held under section 4A(r)-(s) prior to that date.

Based on the City's statement that the EDC board of directors did not vote on the EDC's participation in the Agreement at an open meeting prior to June 20, 2003, it appears that the EDC had neither undertaken nor approved the Agreement or a project associated with the Agreement prior to that date. See Parker Brief, supra note 3, at 3-4. Thus, even if the EDC's participation in the Agreement constituted a "project" under former law, section 14 would not grandfather it.

Finally, we also must consider the extent to which House Bill 2912 affects a section 4A development corporation's authority to make non-project expenditures that were not included within the meaning of the term "project" under former law but which might have been supported by Gaut. By narrowing projects' authorized purpose to primary job creation, requiring and strictly governing contracts for expenditures and direct incentives, and striking the direction that the Act shall be liberally construed, House Bill 2912 effectively superseded Gaut. House Bill 2912's implications for Gaut-based contracts entered into prior to its effective date may raise impairment of contract issues. See TEX. CONST. art. I, § 16 (prohibiting laws impairing the obligation of contracts). In the matter under consideration, however, such issues would arise only if the EDC's board of directors entered into a contract prior to June 20, 2003 agreeing to pay the grant and to refund sales taxes. Based on the brief and official documents submitted by the City, which refer to the Agreement but not to any contract or agreement entered into by the EDC's board in an official final action at an open meeting prior to June 20, 2003, that does not appear to be the case. See part I.A, supra; Parker Brief, supra note 3, at 3-4.

## S U M M A R Y

House Bill 2912 significantly amended the Development Corporation Act of 1979, TEX. REV. CIV. STAT. ANN. art. 5190.6, but contained a grandfather provision continuing former law for a project undertaken or approved before the bill's June 20, 2003 effective date. The Port Arthur Economic Development Corporation is now authorized to grant funds and refund sales taxes to a private corporation to promote economic development if former law authorized it to do so and if paying these funds constitutes a "project" "undertaken or approved" before June 20, 2003. The development corporation's board of directors must demonstrate that a project was "undertaken or approved" either by reference to some final official action taken by the board in an open meeting prior to June 20, 2003, or by reference to the terms of an election held under section 4A(r)-(s) of the Act prior to that date. The grant and sales tax refund were not a "project" under former law. Moreover, because development corporation's board of directors did not vote to make the grant or sales tax refund at an open meeting prior to June 20, 2003, they would not fall within the House Bill 2912 grandfather provision.

Very truly yours,

GREG ABBOTT
Attorney General of Texas

BARRY R. MCBEE
First Assistant Attorney General

DON R. WILLETT
Deputy Attorney General for Legal Counsel

NANCY S. FULLER
Chair, Opinion Committee

Mary R. Crouter
Assistant Attorney General, Opinion Committee